UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.                                             Case No. 6:24-cr-261-CEM-LHP

ALAN FILION,
      a/k/a "Nazgul Swattings,"
      a/k/a "Torswats V3,"
      a/k/a "Third Reich of Kiwiswats,"
      a/k/a "The Table Swats,"
      a/k/a "Angmar," and
      a/k/a "Torswats"

Defendant.

### DEFENDANT'S SENTENCING MEMORANDUM

I.      INTRODUCTION

The Defendant, Alan Filion, is a young man who made some terrible decisions when he was a juvenile. Nonetheless, he hopes that this Court can still see the good in him and extend him mercy at sentencing, particularly since he's been in custody for over a year. To that end, Alan files the instant memorandum in support of his request to be sentenced to a term of probation. As set forth below, the requested sentence would be "sufficient, but not greater than necessary," to accomplish the goals of federal sentencing in this case. *See* 18 U.S.C. § 3553(a).

II.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

A.    The Guilty Plea

On November 13, 2024, pursuant to a written plea agreement, Alan entered guilty pleas to four counts of Interstate Transmission of Threats to Injure in violation of 18 U.S.C. § 875. *See* Pre-Sentence Investigation Report ("PSR") ¶ 7.  As reflected in the Plea Agreement, Alan acknowledged that he freely and voluntarily entered into the plea agreement because he was in fact guilty.

B.    The Upcoming Sentencing Hearing

Alan's sentencing hearing is set for February 11, 2025, at 9:30 a.m. While his family is willing to travel to Orlando to provide support, Alan does not wish to impose any additional financial burden upon them.   As a result, he has asked his family not to travel to Orlando for his sentencing hearing.  The family's Letters of Support are attached. *See Exhibit A, Letters of Support*.

C.    The Offense Conduct

Alan's offense conduct is accurately described in the Pre-Sentence Investigation Report ("PSR"). In summary, a federal law enforcement investigation revealed that Alan made numerous "swatting calls" to individuals throughout the United States when he was a juvenile. He was initially arrested on January 18, 2024, for charges filed in Seminole County, Florida, which arose from a swatting call to a local mosque.  After the United States charged Alan for the same criminal activity, which is Count One of the Information, Seminole

2

County dropped its charges on November 14, 2024.  *Id.* ¶ 28, 115. Alan has been in custody since January 18, 2024.

III.    ALAN FILION'S PERSONAL HISTORY AND CHARACTERISTICS

A.    Alan Filion's Childhood

Alan was born on October 30, 2006, in Lancaster, California and turned 18 this past October. Alan lived in China with his mother from ages three to six and his father would visit them occasionally. At age 12, his parents separated, and Alan's mother moved to Wisconsin while Alan stayed with his father in California. During that time, Alan and his father lived with Alan's aunt and uncle. Alan maintained a close relationship with his mother who saw him every summer for a couple of years. However, as time passed, Alan's relationship with his mother became strained. When Alan visited his mother in Wisconsin, he experienced emotional, verbal and physical abusive. He was subject to corporal punishment, often times for non-disciplinary issues. His mother would often send him to live with maternal relatives who did not spend much time with him.

While Alan's physical needs were met by his father, he was "extremely lonely" during his childhood. Alan, who is arguably a genius, did well academically, but didn't have many friends in school.  He spent a lot of time alone with his computer and never had someone with whom he could share his emotional concerns and feelings. His father disclosed that he can't remember a single time a friend would visit Alan at their home.

B.     Alan's Education

Because of his advanced intelligence, Alan was part of a gifted student program in elementary school. Alan took the American College Test (ACT) in October 2019, when he was 12 years old. He had a remarkable score of 1520. He scored in the 99% as a composite score, 99% in math, 97% in science, 99% in STEM, 99% in English, and 97% in Reading. He received a high school diploma at age 15 from Quartz Hill High School in Lancaster, California.  Alan then enrolled in Antelope Valley College in Antelope, California, from August 2022 until his arrest in 2024. Alan accumulated 100 credit hours with a 3.73 GPA. The defendant obtained an associate of science in mathematics and is pursuing a major in physics. On April 19, 2024, Alan was admitted to the College of Letters and Science at Berkeley University of California for the fall semester of 2024. Alan's goal is still to attend Berkeley to obtain his doctorate degree in physics. He would like to become a physics teacher at either the high school or college level.

While confined at the Seminole County Jail, Alan completed course in parenting skills, theft awareness, parent education & family stabilization, trafficking awareness & prevention, tobacco awareness, HIV/AIDS awareness, domestic violence, food handing, CPR training, first aid training, drug & alcohol awareness, anger management, bullying awareness & prevention, workplace ergonomics, conflict resolution, behavior modification, life skills, and beyond prison, probation and parole. Furthermore, thanks to a motivated teacher at the Seminole County Jail, Ms. Debose, Alan was provided advanced teaching

manuals in science and math.  According to Ms. Debose, Alan was an outstanding student who helped tutor other inmates while in custody as a juvenile.

      C.      <u>Alan's Personal Struggles</u>

Alan grew up with Autism Spectrum Disorder (ASD) which was not diagnosed until just recently by Dr. Spence, Dr. Imhoff and Dr. Danziger.[1]  ASD is a developmental illness with psychiatric and neurologic manifestations, which are significant mental illness, and are unrelated to substance abuse. An individual with ASD may sometimes engage in what can be objectively viewed as criminal or antisocial behavior, while lacking a subjective understanding of its impropriety, and incapable of understanding the emotional impact of their actions on other individuals.  It is Dr. Danziger's opinion that Alan's ASD and his young age at the time of the offenses impacted his ability to understand the wrongfulness of his behavior. The ASD determination cleared up questions that Alan's family had for most of his life. As a child, Alan never had more than one or two friends and never had what would be considered a "close friend." He always had trouble making friends and had to apologize for saying things people reacted badly to. He also had difficulty understanding sarcasm and facial expressions.  He was bullied in high school and hated attending even though he excelled academically.

The question of "How did Alan become involved in making hundreds of swatting calls?" has a straightforward answer.  Alan, who was isolated from his peers during his teens has used the Internet to "connect" with others. Many

---

[1] The reports from Dr. Spence and Dr. Imhoff and Dr. Danziger were provided to probation.

times, the individuals he met on-line in the swatting community were older and more mature. He orchestrated hundreds of swatting calls, many to high profile politicians, which gave him instant recognition on the Internet.  People with ASD "feel safer" communicating from behind a computer screen than in a person-to-person social settings.  As described in the factual basis for his plea agreement, the language and threats Alan used in the swatting calls was horrific.  But given his ASD, the Court should assess whether this language represented Alan's true beliefs or was just made for "shock value" so that the swatting call would be taken seriously. At worst, Alan was indifferent to the various categories of people targeted because ASD causes those afflicted to treat everyone  the same. Consequently, when you compare the swatting calls to mosques, churches, synagogue, universities, and schools, it's clear Alan used a script that he modified depending on the target.

People with ASD also lack empathy or the ability to comprehend the emotional distress and mindset of victims.  The nature of their ASD may make them blind and unaware of the suffering of others.  When Dr. Danziger first interviewed Alan in February 2024, Alan simply viewed his actions as funny and was unaware of the distress his actions caused others. He viewed his actions more along the lines of pranks, thinking that no one was really hurt and there were no long-term consequences. It is Dr. Danziger's opinion this did not represent a callous indifference to the suffering of others, as it might seem at first to an

observer, but instead reflected a mind-blindness, through the prism of Alan's

ASD, as to the emotional impact of his actions upon others.

During a second meeting on December 20, 2024, Alan's view had changed, and he told

Dr. Danziger:

> "a lot of people were harmed by that, I didn't understand the nature of that. The things I said were incomplete, I didn't appreciate their full nature. When I was doing the swatting back then, I didn't understand the impact. I didn't recognize the emotional distress it caused; I was blind to the suffering; I distanced myself from it. I may have recognized intellectually what I was doing, but I didn't understand the emotional distress it caused. I was isolated from it. I was isolated from the police response and the money involved. Now I understand, I have a recognition that it was truly horrible. My thoughts back then were it was like a prank call, but I didn't realize the deeper harm."

He went on to tell Dr. Danziger:

> "extremely so, intellectually I have a better understanding of the emotions. Here in jail, I see people who are antisocial, who enjoy the violence they thrust on others, and I'm upset I was acting similarly. I didn't recognize it at the time, I just thought it was a funny prank. There won't be a second time. I didn't understand the anguish of the people, I'm shocked by the people in jail who are aware of the suffering of others, and they don't care, and maybe they enjoy it. I'm not like that; it's a shocking revelation to me."

According to Dr. Danziger, Alan appears to have gained remorse and an

intellectual understanding that his conduct had caused significant distress to

others.

IV.    SENTENCING GUIDELINES RANGE AND FACTORS WARRANTING A VARIANCE

      A.    U.S. Probation Office's Calculations

Alan's  advisory guideline imprisonment range is 41 to 51 months, based on a total offense level of 22 and a criminal history category of I. *Id.* at 132. However, Alan requests that the Court grant a downward variance and impose a sentence of probation.

      B.      Factors Identified By The Probation Office That Could Justify A Downward Variance

Probation identified the following factors for the Court's consideration in determining whether a sentence below the advisory guideline range is warranted: the defendant's lack of criminal record, his recent mental health evaluations, his upbringing, and his youthful age. *Id.* ¶ 150. The defense would add that the time he's been confined in the Seminole County Jail is an also a factor for a downward variance.

V.      ALAN FILION'S REQUEST FOR A VARIANCE

      A.      Legal Framework For The Granting Of A Variance

Pursuant to *United States v. Booker*, 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (*quoting Koon v. United States*, 518 U.S. 81 (1996)). To guide a court's discretion, section 3553(a)(2), requires sentencing courts to consider not only the advisory guideline range, but also the facts of a

specific case through the lens of several factors, which are discussed below. *See*

18 U.S.C.

§ 3553(a)(1)-(7). In addition, under 18 U.S.C. § 3553(a), a sentencing court must

"impose a sentence sufficient, but not greater than necessary, to comply" with the

purposes of sentencing set forth in the second paragraph of the statute. *See*

*United States v. Short*, 485 F.3d 243, 248 (4th Cir. 2007).

 B. <u>Nature and Circumstances of the Offense</u>

Alan acknowledges the seriousness of his offense and the harm he caused.

 C. <u>Alan's History And Characteristics Justify a Variance</u>
   <u>Alan is a First Time Offender</u>

This is the first time Alan has been in any trouble whatsoever.  Being a

first-time offender has been found by other courts to be justification for a

variance. *See U.S. v. Autery,*   555 F.3d 864 (9th Cir. 2009) (Court imposed

probation where guidelines were 41-51 months because it was the defendant's

first offense.); *U.S. v. Huckins,*  (10th Cir. 2008) 529 F.3d 1312 (First conviction

justified variance from guidelines of 78-97 months to 24 months.)

 <u>Alan was a juvenile when he committed the crimes</u>

At the time Alan made the swatting calls he was 15, 16 or 17 years old.

United States Sentencing Guideline Effective §5H1.1 states that the defendant's

age "may be relevant" as to whether downward departure should be granted.

Federal courts have ruled that the youth of an offender is a mitigating factor

which can give rise to a variance.  *See Johnson v. Texas*, 509 U.S. 350, 367 (1993)

( jury may consider a 19-year-old defendant's youth as a mitigating factor because "youth is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and psychological damage.");  *U.S. v. Feemster,* 572 F.3d 455  (8th Cir.  2009)(en banc) (youthful defendant, age 16, with guidelines of 360 months to life granted downward variance to 120 months); *U.S. v Polito,* (5th Cir. Jan. 31, 2007 No. 06-30133) 2007 WL 313463  (unpub.) (defendant convicted of possession of child pornography and guidelines of 27-33 months, district court's sentence of probation with one year house arrest reasonable in part because defendant was 18 at time of the offense "and very immature...and his age and mental condition prohibited him from acting rationally");  *U.S. v. Allen*, 250 F.Supp.2d 317 (SDNY 2003)(Defendant entitled to 8 level departure from 80 months to 30 months because his mental immaturity-even though 21 behaves like 14 year old.); U.S. v. Stern  590 F.Supp.2d 945, 952 (N.D.Ohio 2008)  (sentence of twelve months and one day because the defendant was 14 when he began his criminal activities and was immature).

<u>Alan has been diagnosed with ASD</u>

As explained above and in the reports provided to the Court from Dr. Danziger, Dr. Imhof, and Dr. Spence, Alan's ASD is a significant factor in why he committed his crimes.  According to Dr. Danziger "it is my opinion the autism spectrum disorder significantly impaired his ability to understand the wrongfulness of his behavior, as he was unable to appreciate the harm and

10

distress his actions were causing the victims. His young age at the time of these offenses, which were committed before his 18th Birthday, is also a factor which may be worthy of consideration in his upcoming sentencing." Consequently, Alan's ASD diagnosis justifies a downward variance.

<u>Alan took "super responsibility" for his crimes</u>

Alan took responsibility early and fully cooperated with the agents during their investigation of his swatting calls. While the FBI may have suspected him of making nearly 400 swatting calls throughout the United States, it is doubtful they would have cleared this many cases without Alan disclosing his passwords and providing them with a roadmap of how he operated. See *U.S. v. DeMonte,* 25 F.3d 343 (6th Cir. 1994) (in computer fraud case, departure proper on ground that defendant admitted to crimes about which government had no knowledge, even though plea bargain required cooperation-remanded).

<u>Alan has been in pre-trial detention since January 2024</u>

Alan was arrested in California on January 18, 2024, for an arrest warrant issued in Seminole County, Florida. The arrest warrant was a swatting call Alan made to a mosque in Seminole County, Florida. After the U.S. Attorney's Office for the Middle District of Florida decided to prosecute Alan for the same incident (Count One of the Indictment), Seminole County dropped its case on November 14, 2024. See PSR, ¶ 114. While federal courts don't have the jurisdiction to award jail credit for time previously served in a state institution, they can award a downward departure. *See Ruggiano v. Reish*, 307 F.3d 121 (3rd Cir. 2002)

(district court has authority under U.S.S.G. § 5G1.3 to adjust a federal sentence for time served (14 months) on a state sentence, in a way that is binding on the Bureau of Prisons-whether called a "departure" a "credit" or an "adjustment.") While the BOP has the sole authority to grant sentencing credits for time served in detention for the  offense for which the defendant is ultimately sentenced, under 5G1.3(c), an adjustment or departure for time served on a preexisting, state charge is within the exclusive power of the sentencing court

>   Alan has made post-arrest rehabilitative efforts.

The Court must consider Alan as he presents on the day of his sentencing. *See Pepper v. United States*, 562 U.S. 476, 492 (2011). As noted above, Alan has engaged in substantial post-arrest rehabilitative efforts, including taking courses at the Seminole County Jail and independent study of chemistry and math using his teacher's manuals.  His goal is to finish college, obtain his doctorate in physics and work as a professor.  The foregoing demonstrates Alan's commitment to rehabilitation.

>   E.   The Requested Sentence Would Be Sufficient . . . .

>   1.   To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

A sentence of probation for Alan, who has never been in trouble before, is sufficient to reflect the seriousness of his specific offense conduct, to promote respect for the law, and to provide just punishment. He is an 18-year-old man who is thin in stature. Although he has managed to adapt to confinement at both

the Seminole and Orange County Jails, prison will undoubtedly be difficult for him. Additionally, he will face lifelong collateral consequences as a convicted felon. This is yet another reason why a sentence of probation is a sufficient punishment. *See United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months' imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon); See also Wayne A. Logan, Informal Collateral Consequences, 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

2.    To afford adequate deterrence to criminal conduct / To protect the public from further crimes of the defendant

The requested sentence of probation would also be sufficient to accomplish the goals of both general and specific deterrence. From a specific deterrence standpoint, Alan has already been deterred from committing additional crimes. The U.S. Justice Department has itself agreed that lengthier sentences do not deter criminal activity. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, Five Things About Deterrence (May 2016)(finding that "the data show long prison sentences do little to deter" and stating that "police deter crime by increasing the perception

13

that criminals will be caught and punished").[2] Based on the foregoing, a sentence above probation is unnecessary to satisfy the goals of deterrence.

3.   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A sentence of probation would allow Alan the opportunity to re-enroll in college and complete his education. It would provide him the opportunity to "give back" to his community by teaching young people. However, no more time beyond the requested sentence will be necessary to achieve these goals. *See Tapia v. United States*, 564 U.S. 319, 335 (2011) ("As we have held, a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation.").

F.   The Kinds of Sentences Available and the Sentencing Guidelines

Turning to the guidelines, the Court must consider them, but "may not presume that the Guidelines range is reasonable" and must make "an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. Further, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.,* at 47. The guidelines can produce sentencing ranges "greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007). The Eleventh Circuit has further stated that "[t]here are…many instances where

---

[2] https://www.ojp.gov/pdffiles1/nij/247350.pdf

the Guidelines range will not yield a reasonable sentence." *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006).  Here, a sentence of probation is permissible and would be sufficient to satisfy the sentencing factors discussed herein.

  G. <u>The Need to Avoid Unwarranted Disparities</u>

  Alan's requested sentence does not in any way create or promote disparity because it's unlikely there will be another defendant like Alan. As noted, Alan is a criminal history category I offender, who made a number of swatting calls when he was 15, 16, and 17 years old and then fully cooperated with law enforcement. His case first came to the Middle District of Florida as a juvenile prosecution which is almost unheard of.

VI. <u>CONCLUSION</u>

  Based on the information discussed in this memorandum, the undersigned hopes that this Court will see that Alan is a good young man who made some bad decisions. He has fully accepted responsibility and understands that he must pay a price for what he has done, but that price should not be more than  a term of probation. In light of the substantial mitigation in this case, including the fact that he's been in custody for over a year, the undersigned asks this Court to sentence Alan to a term of probation. Such a sentence not only satisfies the requirements of § 3553(a) but also accomplishes the ultimate goal of justice in sentencing.

Respectfully submitted this 4th day of February 2025.

/s/ Dan Eckhart, Esq.
DAN ECKHART, ESQ.
Florida Bar No. 488674
200 East Robinson St., Ste. 11
Orlando, FL 32801
Telephone:  407-276-0500
Facsimile:   407-893-8151
dan@daneckhartlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2025,  I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the United States Attorney's Office.

/s/ Dan Eckhart, Esq.
DAN ECKHART, ESQ.
Florida Bar No. 488674

16